## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| OWEN ARENT, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ROCKET COMPANIES, INC., JAY D. FARNER, JULIE R. BOOTH, ROBERT DEAN WALTERS, and DANIEL GILBERT, | |
| Defendants. | |

Plaintiff Owen Arent ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings of Rocket Companies, Inc. ("Rocket" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all purchasers of Rocket Class A common stock between February 25, 2021 and May 5, 2021, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Rocket and certain of the Company's senior officers and directors.

2.     Rocket is the largest mortgage originator in the U.S., with an estimated 9.2% market share as of March 31, 2020.  The Company operates two primary segments: (i) the Direct-to-Consumer segment; and (ii) the Partner Network segment.  In its Direct-to-Consumer segment, Rocket directly interacts with clients and potential clients using various performance marketing channels.  In its Partner Network segment, Rocket partners with third parties who utilize the Company's platform to provide their clients with mortgage solutions.

3.     Rocket's mortgage origination business generates revenues primarily from the gain on sale of loans, which includes loan origination fees, revenues from sales of loans into the secondary market, as well as the fair value of originated mortgage serving rights and hedging gains and losses.  One of the most important metrics in measuring Rocket's financial performance is the Company's gain on sale margin, which refers to the Company's net gain on sale of loans divided by the net rate lock volume for the period, excluding all reverse mortgage activity.  Net rate

lock volume refers to the unpaid principal balance of loans issued by the Company subject to interest rate lock commitments, net of certain factors identified by the Company. The gain on sale margin is viewed by investors as a core measure of Rocket's profitability.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Rocket's gain on sale margins were contracting at the highest rate in two years as a result of increased competition among mortgage lenders, an unfavorable shift toward the lower margin Partner Network operating segment and compression in the price spread between the primary and secondary mortgage markets; (ii) Rocket was engaged in a price war and battle for market share with its primary competitors in the wholesale market, which was further compressing margins in Rocket's Partner Network operating segment; (iii) the adverse trends identified above were accelerating and, as a result, Rocket's gain on sale margins were on track to plummet at least 140 basis points in the first six months of 2021; (iv) as a result of the above, the favorable market conditions that had preceded the Class Period and allowed Rocket to achieve historically high gain on sale margins had vanished as the Company's gain on sale margins had returned to levels not seen since the first quarter of 2019; (v) rather than

remaining elevated due to surging demand, Rocket's Company-wide gain-on-sale margins had fallen materially below recent historical averages; and (vi) as a result of the foregoing, Defendants' positive statements about the Company's business operations and prospects were materially misleading and/or lacked a reasonable basis.

5.     On May 5, 2021, Rocket issued a press release announcing its first quarter results and second quarter outlook.  Rocket reported that it was on track to achieve closed loan volume within a range of only $82.5 billion and $87.5 billion and gain on sale margins within a range of only 2.65% to 2.95% for the second quarter of 2021.  At the mid-point, this gain on sale margin estimate equated to a *239 basis point decline year-over-year* and a 94 basis point decline sequentially, which represented the Company's lowest quarterly gain on sale margin in two years. The collapse in the Company's gain on sale margin reflected the fact that the favorable market conditions purportedly being experienced by the Company during the Class Period had in fact reversed.  During a conference call to explain the results, Rocket's Chief Financial Officer ("CFO") and Treasurer, Defendant Julie R. Booth ("Booth"), revealed that the sharp decline in quarterly gain on sale margin was being caused by three factors: (i) pressure on loan pricing; (ii) a product mix shift to Rocket's lower margin Partner Network segment; and (iii) a compression in price spreads between the primary and secondary mortgage markets.

6.     On this news, Rocket's Class A common stock price fell $3.79 per share, or 16.62%, to close at $19.01 per share on May 6, 2021, on heavy volume of over 37 million shares traded.  As the market continued to digest the news in the days that followed, Rocket's Class A common stock price continued to decline, falling to a low of just $16.48 per share by May 11, 2021.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Rocket Class A common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, because Rocket is headquartered in this Judicial District and many of the acts and practices complained of herein occurred in substantial part in this Judicial District.

10.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff, as set forth in the attached Certification, purchased Rocket Class A common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12.     Defendant Rocket is an online mortgage lender.  Rocket Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RKT."

13.     Defendant Jay D. Farner ("Farner") has served as Rocket's Chief Executive Officer ("CEO") and Vice Chairman at all relevant times.

14.     Defendant Booth has served as Rocket's CFO and Treasurer at all relevant times.

15.     Defendant Robert Dean Walters ("Walters") has served as Rocket's President and Chief Operating Officer at all relevant times.

16.     Defendant Daniel Gilbert ("Gilbert") is the founder and former CEO of Rocket.  During the Class Period, Gilbert served as the Chairman of the Board of Directors of Rocket.

17.     Defendants Farner, Booth, Walters, and Gilbert are collectively referred to herein as the "Individual Defendants."

18.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.   In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.   Defendants' false and misleading misrepresentations and

omissions during the Class Period violated these specific requirements and obligations.

20.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

21.   Rocket and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.   Defendant Gilbert founded Rocket in 1985.  Rocket, based in Detroit, is the largest mortgage originator in the U.S., with an estimated 9.2% market share as of March 31, 2020.  The Company operates the Rocket Mortgage online platform,

which allows clients to apply for and service mortgages through the Internet or by using the Company's proprietary mobile phone app.  Ninety percent (90%) of the Company's revenues are derived from originating, closing, selling, and servicing home mortgages.

23.     Rocket operates two primary segments: (i) the Direct-to-Consumer segment; and (ii) the Partner Network segment.  In its Direct-to-Consumer segment, Rocket directly interacts with clients and potential clients using various performance marketing channels.  In its Partner Network segment, Rocket partners with third parties who utilize the Company's platform to provide their clients with mortgage solutions.  The Partner Network segment has lower operating margins because Rocket shares profits with its partners.  Historically, Rocket's Direct-to-Consumer segment has accounted for the substantial majority of the Company's revenues.  For example, the Direct-to-Consumer segment accounted for approximately 76% of the Company's total revenues for the quarter ended March 31, 2020, compared to 17% of total revenues attributable to Rocket's Partner Network segment during the quarter.

24.     Rocket's mortgage origination business generates revenues primarily from the gain on sale of loans, which includes loan origination fees, revenues from sales of loans into the secondary market, as well as the fair value of originated mortgage serving rights and hedging gains and losses.  One of the most important

metrics in measuring Rocket's financial performance is the Company's gain on sale margin, which refers to the Company's net gain on sale of loans divided by the net rate lock volume for the period, excluding all reverse mortgage activity. Net rate lock volume refers to the unpaid principal balance of loans issued by the Company subject to interest rate lock commitments, net of certain factors identified by the Company. The gain on sale margin is viewed by investors as a core measure of Rocket's profitability.

25.    In August 2020, Rocket completed its initial public offering ("IPO"), selling 100 million Class A shares at $18.00 per share for $1.8 billion in gross offering proceeds. The registration statement for the IPO represented that Rocket was experiencing a historic surge in demand for the Company's products, which had resulted in record-setting gain on sale margin. The registration statement further represented that, for the first six months of 2020, Rocket preliminarily estimated it had achieved over $124 billion in closed loan origination volume, compared to $54 billion in the prior year period, and a gain on sale margin of 5.10% to 5.25%, compared to 3.19% gain on sale margin for fiscal 2019. The registration statement stated that Rocket had "significant opportunity for continued growth as we advance and leverage our technology, brand, scale and commitment to providing an exceptional client experience," stating, in relevant part, as follows:

> We believe our platform and technology create a significant financial advantage. Our brand effectiveness and marketing capabilities optimize

client acquisition investments and our automated processes reduce unnecessary costs across the origination process. We create significant operating leverage through automation. ***We can scale quickly and efficiently which allows us to grow both the number of transactions and transaction profitability***.

26.    On September 2, 2020, after the IPO, Rocket issued a press release announcing its financial results for the second quarter of 2020.  The Company reported "record" closed loan origination volume of $72.3 billion and a gain on sale margin of 5.19% during the quarter, compared to $32 billion closed loan origination volume and 3.23% gain on sale margin during the second quarter of 2019. Defendant Farner commented on the results, claiming that these favorable trends were expected to continue, and stating, in relevant part, as follows:

> "While I'm proud of our performance, ***I am even more encouraged by the significant opportunity that remains in front of us as we continue to execute on our plan of achieving 25 percent market share by 2030***. It is clear that our simple, client-focused, digital approach is continuously and fundamentally disrupting the way our industries do business."

27.    On November 10, 2020, Rocket issued a press release announcing its financial results for the third quarter of 2020.  The Company reported closed loan origination volume of $89 billion and a gain on sale margin of 4.52%.  Defendant Farner commented on the results and hailed Rocket's ability to "maintain[] industry-leading margins and profitability" and the continued strength of the business, stating, in relevant part, as follows:

"While the mortgage industry sits at a critical inflection point, ***Rocket Companies continues to build for the future*** – always looking for the next opportunity. Throughout the first three quarters of 2020, we have generated $6.6 billion in GAAP net income. ***As the Company enters the last quarter of 2020, it does so with all cylinders firing and looks forward to a strong end to the year***."

28.    During an earnings conference call held that same day, Defendant Booth stated that Rocket expected its margins to remain elevated "going into the upcoming years," stating, in relevant part, as follows:

> ***So – and as we look ahead into Q4, margins are still strong by historical standards, and they're continuing to stay elevated. We think that demand that we're going to continue to see with 70% of folks able to refinance and the amount of refinance volumes you take that into the next couple of years, if there's 6 trillion or 7 trillion out there ready to be refinanced, that is something that's going to take years to work through, which will continue to elevate that demand, we believe, going into the upcoming years***. And so we feel really good about where our gain on sale margins and volumes are heading here into the fourth quarter.

29.    During the earnings conference call, in response to another analyst question regarding Rocket's gain on sale margins, Defendant Booth similarly represented that the uptick in demand was expected to last "years," stating that "***the demand that we're seeing now will continue to probably have a nice upward impact on those margins, relative to the sort of historic levels that we have seen into the upcoming years***. How long that will last? It's to be seen, but like I said, ***there's quite a lot of demand still out there into the upcoming years***."

30.    The statements identified in ¶¶ 25-29 above remained alive in the market and uncorrected at the start of the Class Period.

**Materially False and Misleading Statements Issued During the Class Period**

31.    The Class Period begins on February 25, 2021, when Rocket issued a press release titled, in part, "***Rocket Companies Experiences Explosive Growth***," which announced the Company's financial results for the fourth quarter and full year of 2020 (the "4Q/FY20 Press Release").   The Company reported closed loan origination volume of $107.2 billion and gain on sale margin of 4.41% for the fourth quarter.  Rocket emphasized that it had "[i]ncreased gain on sale margin by 100 basis points year-over-year" during the quarter and "[i]ncreased gain on sale margin by 127 basis points year-over-year to 4.46%" for the full-year period.  Rocket also announced a special dividend of $1.11 per share of Class A common stock. Defendant Farner commented on the results, attributing "Rocket Companies' record-breaking fourth quarter and full year 2020 results" and the recently announced special dividend to Rocket's "highly profitable and capital light business model." Rocket claimed that it continued to experience gain on sale margin growth year-over-year, stating that Rocket for the first quarter of 2021 was on track to achieve "[g]ain on sale margins of 3.60% to 3.90%, which would be an improvement of 35 to 65 basis points compared to 3.25% in the first quarter of 2020."

32.    On the same day, Rocket held an earnings conference call with analysts and investors to discuss Rocket's fourth quarter and full-year 2020 results, which was hosted by Defendants Farner, Booth, and Walters.   In her prepared remarks, Defendant Booth repeated the gain on sale margin guidance provided in the 4Q/FY20 Press Release and claimed that Rocket had "finished 2020 on a particularly strong note" as evidenced by "the continued strength and momentum of the Rocket platform."  Defendant Booth also stated, in relevant part, that "[t]he Rocket platform is built to perform and grow in the largest, most complex markets"; that "[o]ur infrastructure also leads to a highly efficient economic model with substantial operating leverage"; and that "[o]ur 2020 results demonstrate Rocket's ability to drive increased scale from a single platform with limited incremental cost."

33.    During the question-and-answer portion of the call, the Individual Defendants repeatedly claimed that Rocket remained in an extraordinary favorable market environment.   For example, Defendant Farner described the real estate market as "red hot" and, in response to an analyst question, stated that demand remained at record highs and downplayed the Company's sensitivity to rising interest rates, stating, in relevant part:

> ***We're seeing strong consumer demand especially in the housing market. I mean, it's the strongest that it's been here in the last decade. And current rates are still incredibly low.*** So that means it's very affordable to buy a home.

And there's still millions of Americans out there that can save well over $100 a month on their monthly payment by refinancing their home. There are also many Americans out there that are looking to invest in their home: home improvements and those sorts of things. ***So like I said, we're seeing strong consumer demand. I know Julie's given the guidance for the next quarter, which is kind of where we're willing to go at this point in time***. I'll draw your attention to the fact that overall, we were able to grow volume twice as fast as the industry in 2020. And so when we think about our opportunity to invest in marketing, invest in technology and continue to grow market share in 2021, we feel very strong about that. And we think that, that investment – it will not only grow our market for mortgage and real estate, but it'll start feeding these other businesses like I talked about: auto, for example, on our platform.

34.     Similarly, Defendant Booth responded to an analyst question about where the Company's gain on sale margins were heading "directionally" over the course of the year by reaffirming that the Company was benefiting from abnormally high demand and claiming that "margins are still well ahead of where they were a year ago."  Defendant Booth further represented that this favorable "momentum" was continuing and that Rocket's competitive advantages allowed it to maintain "profitability in any environment," as reflected in the following exchange:

**James Eugene Faucette** – Morgan Stanley, Research Division – MD

That's really useful. And Julie, you did give very specific guidance for first quarter. So we appreciate that. ***How should we think about, particularly the evolution of gain on sale through the course of the year, at least directionally? And any color you can you can give us to help us think about like what the current environment is for selling of loans and how you're anticipating that, roughly, to evolve over the year?***

15

**Julie R. Booth** – Rocket Companies, Inc. – CFO & Treasurer

Yes. Sure. First of all, say, ***we're still in a very strong demand environment with the Fed buying 95% or so of all conforming mortgage production today. The demand environment's very strong. One thing to remember about us, as well, as a market leader, we also benefit from the scale of our business when we execute into the secondary market. So we have advantages because of that, so we've seen gain-on-sale margins of 4.52% in Q3 of this year. And then we saw continued strength as we came into Q4, coming in at 4.41%. And then as we look ahead into Q1, our expectations, as I said, for gain-on-sale margins are between 3.6% and 3.9%, and this is up from 3.25% in Q1 of last year. So margins are still well ahead of where they were a year ago***. And then I'll also point out at the same time, we're still seeing strong closed loan volume. Our closed loan volume in Q4 of $107 billion and then looking ahead into Q1, between $98 million and $103 billion: with those numbers, that would be the second biggest quarter in our company's history. So to put this in perspective, just a little bit more, the midpoint for our guidance is roughly 95% higher than our Q1 volume. ***So the flexibility of our platform that we've talked about allows us to really run our business for long-term growth and for profitability in any environment. And we're really feeling good about the momentum that we're seeing***.

35.     Later in the conference call, Defendant Walters represented that Rocket was able to maintain the "consistency of those margins" even in a rising interest rate environment because of the Company's competitive advantages, such as its brand and multi-channel platform, stating, in relevant part:

Yes, Dave, I think it's a good question. It's important in a lot of ways, when interest rates have risen in the past, those have been when we've made some of our most powerful share gains. ***We have a lot of advantages that our competitors don't have. And Jay and Julie touched on because of the brand, because of our brand, there's only 1 national mortgage brand, it really allows for the consistency of those margins. So not only are we able to protect those, but also gain share in these sorts of environments***. And there's a lot of different

16

areas that we are gaining those shares. We have we have multiple channels. A lot of our competitors don't have those multiples. And we talked about the Pro channel. And we talk – certainly the direct-to-consumer channel. And there's also a pretty persistent market of less interest rate-sensitive products, whether it be mortgage insurance, whether it be equity extraction. So cash out, we know that homes have risen in an incredible amount. The amount of equity in the market is really substantial. That is – that is something that really will drive the market in the years to come. And then there's also a very, very robust purchase market and – that we're very active in. So you asked for that ideal, that ideal channel or ideal is really – it is these sorts of markets that we have grown in the past and taken advantage of a lot of the attributes that we have that our competitors don't.

36.     During the earnings conference call, in response to an analyst question, Defendant Farner similarly downplayed the effects of competition on the Company's gain on sale margins, stating, in relevant part:

[A]s the market compresses, and these things happen pretty quickly, folks who decided to get into the market by hiring folks and adding bodies and spending money, they find that it gets very hard to be in the mortgage business very quickly. And so the same slack that – the same capacity that went in comes out.

Defendant Farner continued, stating:

And so for those remaining, not only does the margin stabilize and give you the opportunity to see that increase, but it also gives you what you pointed out: great opportunity to grow market share . . . . So it really is a very exciting opportunity for us as we see rates tick up a bit because it creates this process I've just discussed, which leads to market share growth and ***leads a line of sight to really strong future profitability as well for us***.

37.     Defendant Walters followed up on these comments by stating: "If you look back decades, you'll see a very consistent track record of gain on sale," which he claimed was "really one of the, I think, one of the hallmarks of the company."

38.     On March 3, 2021, Defendant Farner presented on Rocket to analysts and investors at the Morgan Stanley Technology, Media and Telecom Conference. In response to an analyst question about how Rocket navigated rising interest rate environments, Defendant Farner stated that Rocket had positioned itself "so we can protect our margin in all different interest rate cycles and grow our company."

39.     On March 24, 2021, Rocket filed its fourth quarter and full-year 2020 results with the SEC on Form 10-K, which was signed by Defendants Farner, Booth, and Gilbert.  The Form 10-K contained financial information regarding Rocket's fourth quarter and full-year 2020 gain on sale margins contained in the 4Q/FY20 Press Release.

40.     On March 29, 2021, two days before the end of the first quarter, Rock Holdings, Inc. ("RHI"), which was majority owned by Defendant Gilbert and overseen by certain of the Individual Defendants, sold 20.2 million Rocket shares at $24.75 per share for nearly $500 million in gross sale proceeds, without disclosing the information listed in ¶ 41 below.

41.     The statements referenced in ¶¶ 31-40 above were materially false and misleading when made because they misrepresented and failed to disclose the

adverse facts about Rocket's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Rocket's gain on sale margins were contracting at the highest rate in two years as a result of increased competition among mortgage lenders, an unfavorable shift toward the lower margin Partner Network operating segment and compression in the price spread between the primary and secondary mortgage markets; (ii) Rocket was engaged in a price war and battle for market share with its primary competitors in the wholesale market, which was further compressing margins in Rocket's Partner Network operating segment; (iii) the adverse trends identified above were accelerating and, as a result, Rocket's gain on sale margins were on track to plummet at least 140 basis points in the first six months of 2021; (iv) as a result of the above, the favorable market conditions that had preceded the Class Period and allowed Rocket to achieve historically high gain on sale margins had vanished as the Company's gain on sale margins had returned to levels not seen since the first quarter of 2019; (v) rather than remaining elevated due to surging demand, Rocket's Company-wide gain-on-sale margins had fallen materially below recent historical averages; and (vi) as a result of the foregoing, Defendants' positive statements about the Company's business operations and prospects were materially misleading and/or lacked a reasonable basis.

19

## The Truth Emerges

42.    On May 5, 2021, Rocket issued a press release announcing its first quarter results and second quarter outlook.  Rocket reported that it was on track to achieve closed loan volume within a range of only $82.5 billion and $87.5 billion and gain on sale margins within a range of only 2.65% to 2.95% for the second quarter of 2021.  At the mid-point, this gain on sale margin estimate equated to a ***239 basis point decline year-over-year*** and a 94 basis point decline sequentially, which represented the Company's lowest quarterly gain on sale margin in two years. The collapse in the Company's gain on sale margin reflected the fact that the favorable market conditions purportedly being experienced by the Company during the Class Period had in fact reversed.  During a conference call to explain the results, Defendant Booth revealed that the sharp decline in quarterly gain on sale margin was being caused by three factors: (i) pressure on loan pricing; (ii) a product mix shift to Rocket's lower margin Partner Network segment; and (iii) a compression in price spreads between the primary and secondary mortgage markets. Defendant Booth also admitted that certain of these trends began "at the end of Q1"—*i.e.*, before the massive insider sales by RHI.

43.    On this news, Rocket's Class A common stock price fell $3.79 per share, or 16.62%, to close at $19.01 per share on May 6, 2021, on heavy volume of over 37 million shares traded.  As the market continued to digest the news in the

days that followed, Rocket's Class A common stock price continued to decline, falling to a low of just $16.48 per share by May 11, 2021.

44. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Rocket Class A common stock, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

45. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Rocket, and their control over and/or receipt and/or modification of Rocket's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

46. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the

reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

47.    The Individual Defendants, because of their positions with Rocket, controlled the contents of Rocket's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Rocket's corporate statements and is, therefore, responsible and liable for the representations contained therein.

48.    The scienter of Defendants is further underscored by the mandated certifications under the Sarbanes-Oxley Act of 2002 of Defendants Farner and Booth filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Rocket was made known to them and that the Company's disclosure-related controls were operating effectively.

49.     In addition, RHI, which was majority owned and controlled by Defendant Gilbert and had been overseen by certain of the Individual Defendants, sold nearly $500 million worth of Rocket stock at $24.75 per share during the Class Period.  These sales occurred on March 29, 2021, just two days before the end of Rocket's first fiscal quarter.

## LOSS CAUSATION

50.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Rocket Class A common stock and operated as a fraud or deceit on Class Period purchasers of Rocket stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Rocket common stock declined significantly as the prior artificial inflation came out of the stock's price.

51.     As a result of their purchases of Rocket common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e*., damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Rocket Class A common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $43.00 per share on March 2, 2021.

52.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Rocket's business, risks, and future financial prospects.  When the truth about the Company was revealed to the market, the price of Rocket Class A common stock fell significantly, dropping to below $17.00 per share by May 11, 2021, removing the inflation therefrom and causing economic loss to investors who had purchased Rocket Class A common stock during the Class Period.

53.    The decline in the price of Rocket Class A common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Rocket Class A common stock negates any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

54.    The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Rocket Class A common stock and the subsequent significant declines in the value of Rocket Class A common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

55.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements plead herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements plead herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Rocket who knew that those statements were false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this action as a class action on behalf of a class consisting of all persons and entities who purchased Rocket Class A common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, and members of their immediate families, and their legal representatives,

heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rocket Class A common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Rocket or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

58.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' statements during the Class Period were materially false and misleading;

(b)     whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

61.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

62.     At all relevant times, the market for Rocket Class A common stock was an efficient market for the following reasons, among others:

(a)     Rocket common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, Rocket filed periodic public reports with the SEC;

(c)     Rocket regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Rocket was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

63.    As a result of the foregoing, the market for Rocket Class A common stock promptly digested current information regarding Rocket from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Rocket Class A common stock during the Class Period suffered similar injury through their purchases of Rocket common stock at artificially inflated prices and a presumption of reliance applies.

64.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), because the Class's claims are,

in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

65.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Rocket common stock during the Class Period.

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rocket Class A common stock.  Plaintiff and the Class would not have purchased Rocket common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Rocket Class A common stock during the Class Period.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against All Defendants)**

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.    The Individual Defendants acted as controlling persons of Rocket within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Rocket stock, the Individual Defendants had the power and authority to cause Rocket to engage in the wrongful conduct complained of herein.  Rocket controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Designating Plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  July 13, 2021                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*